MacDonald, D. Lloyd, J.
This is a consolidated appeal pursuant to G.L.c. 40A, §17 from a decision of the Zoning Board of Appeals (the “ZBA”) of the Town of Mansfield (the “Town”) granting a special permit to allow the defendants Peter DeTrolio and Maryann DeTrolio (the “DeTrolios”) to modify certain landscaping and screening buffers required by the Town’s Zoning By-Law (the “By-Law”). The Court took a view of the premises, and a two-day trial was held. 32 exhibits were entered. The Court makes the following findings of fact and rulings of law in allowing the plaintiffs’ appeal and annulling the ZBA’s decision.
Findings of Fact
1. The DeTrolios own real property at 428 Elm Street, Mansfield (the “Premises”).
2. Peter DeTrolio is a current and longstanding member of the ZBA. He recused himself from the ZBA proceeding giving rise to the instant appeal.
*21 3. The plaintiffs Gregory and Diane Matoian (the “Matoians”) own real property located at 3 Coach Road, Mansfield (the “Matoian Property”). The Matoian property abuts the Premises on the east side.
4. The plaintiffs Michael Rae and Katie Rae (the “Raes”) own real property on the south side of the Premises at 430 Elm Street, Mansfield.
5. The defendants Erick Butler, Oliver Kozlowski, Elisabeth Garber-Miller and Jack Vultaggio are members of the ZBA, and they unanimously voted in favor of the special permit at issue.
6. On March 23, 2005 the DeTrolios applied to the ZBA for a special permit pursuant to Section 4.3.5 of the By-Law. Their application sought relief from Sections 4.3.6 (Landscaped Buffer Strips) and 4.3.9 (Landscaping Adjacent to Buildings) of the By-Law.
7. The Premises is located in a B-3 (Highway/Business) zoning district.
8. The Matoians’ and the Raes’ properties are located in a residential zoning district.
9. Retail uses are permitted as of right in a B-3 district.
10. The DeTrolios for manyyears operated avariety store at the Premises, but they closed the store in 2003.
11. The development that is the subject of their application to the ZBA is the DeTrolios’ proposal to raze the 2,144-square-foot structure of the former store and replace it with a 4,400-square-foot building housing a 24-seat restaurant and a retail space of 2,900 feet.
12. The plan of the development that was submitted to the ZBA was prepared by a licensed land surveyor who was neither an architect nor an engineer.
13. The proposed development complies in all respects with the dimensional and parking requirements of the By-Law as relates to a B-3 district. However, the DeTrolios sought relief by special permit from certain landscaping and screening requirements of section 4.3 of the By-Law. Those requirements are applicable to commercial developments adjacent to residential districts.
14. Specifically, By-Law Section 4.3.6.B.l.b requires “Landscaped buffer strips abutting or across the street from a residential district shall be a minimum of fifteen (15) feet in depth in commercial districts ...”
15. And Section 4.3.9 states, “Landscaped areas at least ten (10) feet in depth shall be provided adjacent to buildings on every side of such buildings that has a public access point, and shall contain trees and shrubs.”
16. Section 4.3.5(A) of the By-Law provides that deviations from the landscaping and screening requirements can be obtained only by special permit.
17. However, Section 4.3.5(B) states that “no such special permit shall be granted unless the [ZBA] finds that the proposed landscaping arrangement meets the general purpose, intent and objectives of this section and in addition makes one of the following findings:
1. The alternative landscaping arrangement proposed by the applicant is clearly preferable for the site and surroundings than one strictly conforming to the standards of this section.
2. It is impractical to provide the specified depth of the landscaped area due to the size, shape or other characteristics of the parcel beyond the control of the applicant, and the alternative arrangement proposed by the applicant provides equivalent benefits to the site and surrounding areas.
18. The DeTrolios’ application proposed a landscaped buffer strip along their boundaiy with the Matoians and the Raes of five feet, i.e., ten feet less than the fifteen feet required by the By-Law. It further eliminated altogether the otherwise required ten-foot landscaped area in front of the building through which the public would have access.
19. The application also proposed to place a dumpster within the reduced five-foot buffer strip in the southeastern comer of the locus (proximate to both the Matoian and Rae properties).
20. On the south (the Raesj side of the Premises, the proposed five-foot-wide buffer strip is comprised of a stockade fence and a line of arborvitae trees. On the east (Matoian) side, the plan proposed a line of arborvitaes, as well.
21. There is an existing stockade fence running approximately a third of the way along the eastern boundaiy with the Matoians. The fence was installed by the Matioans before the present litigation was brought. The Matoians also have a shed adjacent to the Premises’ eastern boundaiy.
22. Arborvitae are a dense, fast growing variety of evergreen tree commonly used for border landscaping. Once grown out and in sufficient numbers, they provide a substantially opaque visual barrier between adjacent properties.
23. The landscape architect retained by the DeTrolios prepared the landscape plan without visiting the site.
24. The essence of the five-foot buffer strip as proposed by the DeTrolios is a single row of dense evergreens proceeding curtain-like along the Mato-ian/Rae periphery.
25. A reasonably designed fifteen-foot landscaped buffer strip would have a very different look and feel than the DeTrolios’ proposed five-foot buffer strip. Such a plan would provide the same or a superior visual barrier. Further, with the ten additional feet of depth within which to plant trees and shmbs, the buffer would have more of the feel and texture of a natural landscape common to residential areas.
26. The DeTrolios’ proposed five-foot buffer strip would provide a visual barrier, but it would not possess and project the organic and natural quality that *22 a fifteen-foot landscaped buffer would have which was reasonably designed in keeping with the objectives and purposes of the By-Law.
27. A reasonably designed fifteen-foot landscaped buffer strip would be preferred by any residential neighbor who is concerned for separation from an adjoining commercial property and who values the look and texture of a more natural landscape.
28. Substantially within the area that otherwise would be the easterly landscaped fifteen-foot buffer, the DeTrolios proposed a fourteen-foot paved public access drive-through. The drive-through includes spaces for employee parking along the easterly (Mato-ian) side of the property.
■29. The rear drive-through was also designed in order to allow the loading function of the building to be done through the rear, i.e., on the easterly side. As a result, the traffic and sounds incident to loading and unloading would occur next to the Matoians.
30. A public hearing on the proposed development was held before the ZBA on May 3, 2005. On May 31, 2005 the Board rendered its decision, approving (as noted, unanimously) the special permit. The ZBA’s findings were as follows:
1. The proposed landscaping arrangement meets the general purpose, intent and objectives of the By-Law;
2. It is impractical to provide the specified depth of landscaped area due to the size, shape and characteristics of the property beyond the control of the applicant; and
3. the alternative arrangement proposed by the application provides better benefits to the surrounding area.
31. Section 4.3.6(A)(3) ofthe By-Law states: “Plantings and landscaped buffer strips shall be arranged to provide maximum protection to adjacent properties ...”
32. The proposed building, the fourteen-foot paved drive-through around the eastern and southern perimeter of the Premises and the location of the proposed dumpster each, and all, materially increase the Matoians’ and the Raes’ physical exposure to the commercial use of the Premises. This includes exposure to the comings and goings of the proposed restaurant’s and retail space’s employees and customers and the sounds, noise and night-time lights incident thereto. The prospect of such exposure was plainly evident to the Court on its view of the Premises and from the Court’s examination of the plans and projected views from the east and the south (Exhibits B, E, F, G and H).
33. The reduction of the landscaped buffer area along the eastern and southern boundaries of the property would increase materially the Matoians’ and Raes’ exposure to commercial uses over and above what would be their exposure to such uses if the proposed development was designed in compliance with the By-Law.
34. Conversely, if the proposed development had been designed in compliance with the By-Law, the Matoians and the Raes (and any other reasonable owner of residential property in their circumstances) would be commensurately benefited by the natural and spatial amenities which the fifteen-foot landscaped buffer strips would provide.
35. The increased exposure to commercial uses caused by the proposed development would materially reduce the fair market value of the Matoians’ and Raes’ properties because of the unpleasant impact of the lots’ increased exposure to the commercial use of the Premises. The adverse impact would be particularly felt by the Raes because of the proximity of their house to the DeTrolios’ property line and because the Raes’ spacious backyard, with its natural play area for children, extends along the south side of the Premises next to the proposed public drive-through and the dumpster location.
36. The registered land surveyor who prepared the DeTrolios’ plans acknowledged that a restaurant and retail development similar to that proposed could in fact be accommodated on the Premises in compliance with the landscaping and buffer strip provisions of the By-Law. The Court adopts his conclusion in that regard as a fact.
37. However, the surveyor stated that such a revised plan would require the loading function to be relocated to the front of the building. And, he stated that the size of the building would have to be reduced by approximately 880 square feet because of the reduced area available for parking. The Court also so finds.
38. On the basis of the land surveyor’s testimony (and there being no evidence to the contrary before the Court), the Court concludes that there is nothing in the size, shape or other characteristics of the Premises that would prevent a viable commercial structure of approximately 3100 square feet being constructed on the Premises.
Rulings of Law
1. The ZBA is theTown ofMansfield’s special permit granting authority. By-Law §7.2.2.B.
2. The ZBA may approve a special permit “when it has been determined that the application and plans meet the submission and technical requirements of this by-law and the benefits of the proposed project outweigh its detrimental effects, after consideration of all appropriate criteria.” Id.
3. To challenge the decision of a local zoning board a person must be “aggrieved.” G.L.c. 40A, §17. The requirement is jurisdictional. Chongris v. Board of Appeals of Andover, 17 Mass.App.Ct. 999, 1000 (1984).
4. The plaintiffs are “parties in interest” because they are abutters. G.L.c. 40A, §11.
5. The plaintiffs have a rebuttable presumption of standing as aggrieved persons. To challenge an abutting neighbors’ standing, a defendant must introduce evidence to rebut the presumption. A challenge, standing by itself, is insufficient to meet a defendant’s *23 burden. Watros v. Greater Lynn Mental Health and Retardation Ass’n, Inc., 421 Mass. 106, 111 (1995).
6. The phrase, “persons aggrieved,” is not to be narrowly construed. Marotta v. Board of Appeals of Revere, 336 Mass. 199, 202-04 (1957). Accord Marashlian v. Zoning Bd. of Appeals of Newburyport, 421 Mass. 719, 721 (1996).
7. If refuted by evidence to the contrary, the burden of proof reverts back to the plaintiff for proof that he or she is an “aggrieved person.” Standerwick v. Zoning Bd. of Appeals of Andover, 64 Mass.App.Ct. 337, 341 (2005).
8. Under such circumstances, a plaintiff must put forth evidence that demonstrates “by direct facts and not by speculative personal opinion” the likelihood of tangible harm to his or her legal rights or cognizable interests. Barvenik v. Board of Appeals of Newton, 33 Mass.App.Ct. 129, 132 (1992).
9. The issue of aggrievement turns on whether the plaintiffs can credibly assert a real and substantial infringement of a legal right. Marashlian at 721.
10. A fact based allegation of a violation of “a private right, property interest, or legal interest” will be sufficient. Harvard Square Defense Fund, Inc. v. Planning Bd. of Cambridge, 27 Mass.App.Ct. 491, 493 (1989).
11. The injury must be particular to the petitioner and “substantially different from that of all of the other members of the community who are frustrated and inconvenienced.” Nickerson v. Zoning Bd. of Appeals of Raynham, 53 Mass.App.Ct. 680, 683-84 (2002). Accord Barvenik, 33 Mass.App.Ct. at 132.
12. Additionally, the plaintiffs injury must be of the iype the zoning laws are created to prevent. Bedford v. Trustees of Boston University, 25 Mass.App.Ct. 372, 376-78 (1988). See also 1 Am.Jur.3d, Zoning Violation §7 (1988).
13. If the zoning by-law creates a protected interest within the scope and concern of the by-law, then standing may be based on evidence of the violation of that protected interest. Monks v. Zoning Board of Appeals of Plymouth, 37 Mass.App.Ct. 685, 688-89 (1994) (although concerns about visual impact are ordinarily insufficient to confer standing, where the town by-law at issue referenced “the visual character and quality of the neighborhood,” it created a “protected interest” on which standing could be predicated).
14. The Raes and the Matoians have standing as aggrieved persons. Their claims directly relate to the purposes and intent of the landscaping and screening by-law as contained in Section 4.3.1 and the objectives articulated in Section 4.3.2(B) and (C). The dimensions and other requirements of the by-law created a protected interest. The violation of those provisions of the by-law to the detriment of the plaintiffs is sufficient to establish the plaintiffs’ standing. The alleged violations tangibly affect the plaintiffs’ use and enjoyment of their properties and the financial value of the same.
15. The principles guiding the Court’s review of a permit granting authority’s decision pursuant to G.L.c. 40A, §17 were reaffirmed in the Appeals Court in Tisbury Fuel Service, Inc. v. Martha’s Vineyard Commission, 68 Mass.App.Ct. 773 (2007). The Court began by quoting Pendergast v. Board of Appeals of Barnstable, 331 Mass. 555, 558-59 (1954):
Upon appeal, it is the duty of the judge to hear all the evidence and to find the facts. He is not restricted to the evidence that was introduced before the board. The decision of the board is competent evidence to enable the judge to ascertain what conclusion the board reached in order that he may determine whether upon the facts found by him the decision of the board should stand or should be annulled or should be modified. In a word, the matter is heard de novo and the judge makes his own findings of fact, independent of any findings of the board, and determines the legal validity of the decision of the board upon the facts found by the court, or if the decision of the board is invalid in whole or in part, the court determines what decision the law requires upon the facts found.
16. The Tisbury Fuel court continued: “General Laws c. 40A, § 17, ‘retains from earlier practice the unique form of judicial review applicable peculiarly to zoning cases, whereby the court finds the facts de novo and measures the legal sufficiency of the board of appeals’ decision against the court’s findings of fact rather than against those found by the board.’ Green v. Board of Appeals of Provincetown, 26 Mass.App.Ct. 469, 473 n.6, 529 N.E.2d 159 (1988).” Tisbury Fuel 68 Mass.App.Ct. at 776.
17. “The decision of the board cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary.” MacGibbon v. Board of Appeals of Duxbury, 356 Mass. 635, 639 (1970).
18. G.L.c. 40A, §9 provides that “(s]pecial permits may be issued only for uses which are in harmony with the general purpose and intent of the ordinance or by-law, and shall be subject to general or specific provisions set forth therein.”
19. As the parly seeking a special permit, the plaintiff has the burden of proof on appeal. Kirkwood v. Bd. of Appeals of Rockport 17 Mass.App.Ct. 423, 427 (1984).
20. “As for the first inquiiy [in a special permit case], an essentially legal analysis is required to decide whether the board’s decision was based on ‘a legally untenable ground,’ or, stated in a less conclusoiy form, on a standard, criterion, or consideration not permitted by the applicable statutes or by-laws.” Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass.App.Ct. 68, 73 (2003).
21. “Although interpretation of the by-law is in the last analysis a judicial function, deference is owed to a local zoning board’s home grown knowledge about the history and purpose of its town’s zoning by-law.” Duteau v. ZBA of Webster, 47 Mass.App.Ct. 664, 669-70 (1999).
*24 22. “The second inquiry [with regard to a special permit] is different. Assuming that the [ZBA] has drawn on proper criteria and standards, the court then must determine, on the basis of the facts it has found for itself, whether the board has denied the application by applying those criteria and standards in an ‘unreasonable, whimsical, capricious or arbitrary’ manner. More specifically, when reviewing a denial of an application for a permit governed by G.L.c. 40A, §6 [as it is for permits governed by G.L.c. 40, §9], the question for the court is whether, on the facts the judge has found, any rational board could conclude that the addition or alteration the applicants propose would be substantially more detrimental to the neighborhood than the existing structure.” Britton, 59 Mass.App.Ct. at 73.
23. “As a consequence, the board’s discretionary power of denial extends up to those rarely encountered points where no rational view of the facts the court has found supports the board’s conclusion that the applicant failed to meet one or more of the relevant criteria found in the governing statute or by-law.” Id. at 74-75. See also Schiffone v. ZBA of Walpole, 28 Mass.App.Ct. 981, 984 (1990) (“[I]t is ‘the board’s evaluation of the seriousness of the problem, not the judge’s, which is controlling,’ ” quoting Subaru of New England, Inc. v. Board of Appeals of Canton, 8 Mass.App.Ct. 483, 488 (1979), in turn quoting from Copley v. Board of Appeals of Canton, 1 Mass.App.Ct. 821 (1973)).
24. The ZBA’s decision must rest on rational findings based on articulated facts and may not rest on the mere recitation of statutory or by-law text. Brackett v. Board of Appeal of the Bldg. Department of the City of Boston, 311 Mass. 52, 54-55 (1942).
25. The general purpose and intent of the landscaping and screening provisions of the By-Law are stated in Section 4.3.1 as being “to enhance the visual quality of the Town’s commercial areas, to encourage the creation and protection of open space, to avoid expansive development of impervious surfaces, to protect and preserve the Town’s ecological balance and to ensure that landscaping is an integral part of development.”
26. The By-Law further specifies its objectives in this regard in Section 4.3.2. Such objectives include the following:
“Buffer strips adjoining or facing residential zoning districts shall provide the strongest possible visual barrier between uses at pedestrian level and create a strong impression of spatial separation.”
“Landscaping within parking areas shall provide visual and climatic relief from broad expanses of pavement and shall be designed to define logical areas for pedestrian and vehicular circulation and to channel such movement on and off the site.”
“It is the intent of this section to count all buffer and landscape area toward the open space requirement for the underlying zone.”
27. The ZBA’s decision must be annulled because the ZBA failed to use the proper criteria and standards in making its decision. No fair assessment of the DeTrolios’ plan could conclude that it “meets the general purpose, intent and objectives” of the landscaping and screening provision of the By-Law. The core interest of the latter is to promote the incorporation of natural buffers to minimize visual and related impacts of commercial uses on adjacent residential areas and to maximize the sense of natural open space. As such, the DeTrolios’ special permit is not “in harmony with the general purpose and intent of the ordinance or by-law.” G.L.c. 40A, §9.
28. The ZBA’s action was based on a legally untenable ground and was unreasonable, whimsical, capricious and arbitrary.
29. Further, the ZBA in making its findings did nothing more than repeat the text of Section 4.3.5 of the By-Law. For that reason alone the decision cannot stand.
30. Finally, there is no basis in the evidentiary record which could support a conclusion that either of the two additional circumstances required by Section 4.5.3 for the issuance of a special permit exists. Namely, no reasonable person could find that the alternative landscaping arrangement as proposed by the DeTrolios is “clearly preferable” for the site and surroundings than one that would strictly conform to the By-Law.
31. Nor could any reasonable person conclude that that it would be “impractical” to comply with the By-Law “due to the size, shape or other characteristics of the parcel beyond the control of [the DeTrolios] and the alternative arrangement proposed by [the DeT-rolios] provides equivalent benefits to the site and the surrounding area.” As testified to by the DeTrolios’ own licensed surveyor who prepared their plan, an alternative plan complying with the landscaping and screening by-law could have been readily prepared, albeit with a reduction in floor space.
32. The loss of value which the latter would entail, however, is not a basis for relief. See McGee v. Board of Appeal of Boston, 62 Mass.App.Ct. 930, 932 (2004).
33. The reduction of the buffer area from fifteen feet to five feet and the proposed screen therein comprised of a single row of arborvitaes cannot reasonably be said to provide “equivalent benefits” to those that the Matoians and the Raes would enjoy with a reasonably designed fifteen-foot landscaped buffer strip.
34. Similarly, there was no reasoned basis for excluding from the plan altogether the ten-foot landscaped area at the front of the building, which is the building’s point of public access.
35. Accordingly, the plaintiffs’ appeals are allowed and the ZBA’s decision is vacated.
ORDER
The decision of the defendant Mansfield Zoning Board of Appeal is ANNULLED.